## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## EASTERN DIVISION

| | |
|---|---|
| JOVIDA A. OWENS, | |
| Plaintiff, | Case No. 20-CV-2075-LRR-KEM |
| vs. | **REPORT AND RECOMMENDATION** |
| KILOLO KIJAKAZI, | |
| Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Jovida A. Owens seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Owens argues that the administrative law judge (ALJ), Michael Lee Larner, erred in finding her depression nonsevere, in failing to analyze Listings 1.02A and 1.08, and in determining her residual functional capacity (RFC). I recommend **affirming** the Commissioner's decision.

### I.  BACKGROUND[1]

Owens, born in 1979, has worked sporadically at factories over the years, usually for only a few months at a time. AR 223. Her annual earnings have never amounted to substantial gainful activity. AR 87, 209. She last worked at a meat-packing plant part-time from February to April 2017. AR 223. She stopped working after sustaining severe injuries in a train accident.

---

[1] For a more thorough overview, see the Joint Statement of Facts, filed at Doc. 22. Facts without a record citation are taken from the Joint Statement of Facts.

Owens was hospitalized for more than two months after being hit by a train as a pedestrian on April 23, 2017. She suffered injury to her left leg from the hip to below her knee. She sustained burns, lost muscle tissue and tendons (bone was visible), and required multiple surgeries, including debridements and skin grafts. She also underwent physical therapy. She was discharged to home on June 29, 2017, with follow-up appointments and outpatient rehabilitation scheduled. AR 1386-87, 1563.

While hospitalized, she applied for SSI benefits, alleging disability since the date of the accident. Although she did not allege depression as an impairment, she reported being depressed in function reports, and she was referred for a psychological consultative examination with psychologist Dr. Carroll Roland, PhD, on September 18, 2017. AR 1660-1664. After receiving Dr. Roland's report, the Social Security Administration denied Owens's SSI application on initial review in October 2017 and upon reconsideration in January 2018. AR 104-134. Owens requested review before an ALJ, and the ALJ held a hearing by video on June 3, 2019. Prior to issuing his decision, the ALJ referred Owens to Dr. Brian Allen, DO, for a physical consultative examination. *See* AR 1858-1863.

On July 31, 2019, the ALJ issued a written opinion, following the five-step process outlined in the regulations.[2] AR 26-37. The ALJ found Owens suffered from three medically determinable impairments—history of de-gloving injury to the left lower extremity with subsequent grafting procedures, depression, and substance abuse disorders—but found only the first of these impairments severe. AR 28. At step three,

---

[2] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." **King v. Astrue**, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)**. The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." **Goff v. Barnhart**, 421 F.3d 785, 790 (8th Cir. 2005) (quoting **Eichelberger v. Barnhart**, 390 F.3d 584, 591 (8th Cir. 2004)).

the ALJ found Owens's impairments did not meet or equal any listings without discussing any particular listing. AR 30. For purposes of determining Owens's ability to work (at steps four and five), the ALJ determined Owens's RFC[3]:

> [She] has the [RFC] to perform light work . . . except she has the ability to stand [and/or] walk for two hours out of an eight-hour workday; the ability to occasionally climb ramps and stairs, balance, and stoop; she can never climb ladders, ropes, or scaffolds, kneel, crouch, or crawl.

AR 30. Based on her RFC, age, education, and work experience, the ALJ found that jobs existed in significant numbers in the national economy Owens could perform, including document preparer, addresser, and stuffer. AR 36-37. Thus, the ALJ found Owens not disabled. AR 37.

Owens appealed the ALJ's decision to the Appeals Council. The Appeals Council denied review on May 28, 2020 (AR 11-13), making the ALJ's decision the final decision of the Commissioner.[4] The Appeals Council extended the time to appeal (AR 1), and Owens filed a timely complaint in this court, seeking judicial review of the Commissioner's decision (Docs. 1, 3).[5] The parties briefed the issues (Docs. 22, 28-30), and the Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa, referred this case to me for a Report and Recommendation.

## II. DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole."[6] "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."[7] The

---

[3] RFC means "the most that a claimant can do despite her limitations." ***Sloan v. Saul***, 933 F.3d 946, 949 (8th Cir. 2019).

[4] *See* **20 C.F.R. § 416.1481**.

[5] *See* **20 C.F.R. § 422.210(c)**.

[6] ***Kirby v. Astrue***, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**.

[7] ***Kirby***, 500 F.3d at 707.

court "do[es] not reweigh the evidence or review the factual record de novo."[8] If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision."[9]

Owens raises three points of error. First, she argues that the ALJ should have included depression as a severe impairment at step two. Second, she argues that her impairments meet or equal Listings 1.02A and 1.08. Finally, she argues the ALJ should have included additional limitations in her RFC, including the inability to walk without a cane, to sit for six hours in a day, and to concentrate without limitation.

### A. *Severe Impairment*

During step two, whether evaluating a physical or mental impairment, the ALJ must first "determine whether [a claimant] ha[s] a medically determinable . . . impairment[]" that "result[s] from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques."[10] If the ALJ determines the claimant suffers from a medically determinable impairment, the ALJ must next decide whether the impairment is severe by evaluating the degree of functional limitation caused by the impairment.[11] An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities,"—for example, the ability to walk, sit, lift, reach, understand and follow instructions, use judgment, or deal with changes in a routine work setting.[12] An impairment is not severe if it "would have no more than a minimal effect on the claimant's

---

[8] ***Naber v. Shalala***, 22 F.3d 186, 188 (8th Cir. 1994).

[9] ***Robinson v. Sullivan***, 956 F.2d 836, 838 (8th Cir. 1992).

[10] **20 C.F.R. § 416.921**.

[11] *Id.*; **20 C.F.R. § 416.922**.

[12] **20 C.F.R. §§ 416.920(c), 416.922**.

4

ability to work."[13] "Severity is not an onerous requirement for the claimant to meet" (and has been described as a de minimus standard), "but it is also not a toothless standard."[14]

The ALJ must apply a "special technique" to evaluate the severity of mental impairments, considering the claimant's limitations in "four broad functional areas . . . : [u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself."[15] Although subject to exception, as a general rule, if the claimant suffers no more than mild limitations in each category, the claimant's mental impairments are not severe.[16]

Here, the ALJ found that Owens suffered from depression but found it nonsevere. AR 28. The ALJ applied the special technique for mental impairments, finding Owens suffered no limitation in interacting with others and only mild limitations in understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; and adapting or managing oneself. AR 29.

In arguing that the ALJ erred, Owens relies on Dr. Roland's consultative examination. AR 1660-64. The report indicates that Owens graduated from high school, where she was an average student and did not take special education classes, and went on to obtain an associate's degree. AR 1661. She reported watching television, playing cards and board games, attending church, and being able to manage her finances. AR 1662. On objective examination, Dr. Roland found her attention, concentration, and memory intact. AR 1663-64. He noted:

> Immediate retention and recall was intact as measured by [Owens's] ability to remember 2 out of 3 unrelated words following a five minute delay. This

---

[13] ***Dixon v. Barnhart***, 353 F.3d 602, 605 (8th Cir. 2003) (quoting ***Simmons v. Massanari***, 264 F.3d 751, 755 (8th Cir. 2001)); *accord* **20 C.F.R. § 416.922(a)**.

[14] ***Kirby***, 500 F.3d at 708; ***Hudson v. Bowen***, 870 F.2d 1392, 1395 (8th Cir. 1989).

[15] **20 C.F.R. § 416.920a(c)(3)**.

[16] **20 C.F.R. § 416.920a(d)(1)**.

5

indicates the ability to remember multi-step instructions given by supervisory personnel.

AR 1663. For counting and calculations, Dr. Roland tested Owens's ability to count to 50 and back by 5s, which she was able to do, and compute serial 7s (counting backward from 100 by 7s), which she was unable to do. AR 1664. The depression questionnaire Owens completed indicated moderate depression, but Dr. Roland noted her clinical presentation suggested only mild depression. AR 1663. Dr. Roland concluded:

> [Owens's] primary deterrent to full[-]time competitive employment appears to be physical limitations secondary to a pedestrian/train accident. [Owens's] memory and intellect are intact for entry level competitive employment. She is able to relate effectively to others.

*Id.* at 1664.

Dr. Roland's report does not support that Owens's depression was severe or that the ALJ should have included mental limitations in Owens's RFC, as Owens argues. The ALJ considered Dr. Roland's report, as well as the opinions of the state agency psychological consultants, Owens's activities of daily living, her lack of mental-health treatment, normal mental-status examinations, and depression screening questionnaire responses that indicated only mild depressive symptoms. AR 29, 1649-50, 1653, 1670, 1674, 1677, 1691, 1758, 1762, 1861. Substantial evidence supports the ALJ's determination that Owens's depression caused no more than minimal limitations on her ability to work (and that she did not otherwise suffer limitations in concentration). I recommend finding that the ALJ did not err in finding Owens's depression nonsevere.

### B. *Listings 1.02A and 1.08*

Owens argues that the ALJ should have analyzed whether her impairments met or equaled Listing 1.02 (major dysfunction of a joint) and Listing 1.08 (soft tissue injury). During the third step of the disability determination, the ALJ considers whether the claimant's impairment or combination of impairments meets or equals one of the listings of presumptively disabling impairments set forth at 20 C.F.R. part 404, subpart P,

appendix 1.[17]  "[A claimant's] impairment[] meets the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement."[18]  A claimant can equal the listings in one of three ways:

> (1)(i) If [the claimant] ha[s] an impairment that is described in [the listings], but—
> > (A) [The claimant] do[es] not exhibit one or more of the findings specified in the particular listing, or
> > (B) [The claimant] exhibit[s] all of the findings, but one or more of the findings is not as severe as specified in the particular listing,
> 
> (ii) [The Social Security Administration] will find that [the claimant's] impairment is medically equivalent to that listing if [the claimant] ha[s] other findings related to [the] impairment that are at least of equal medical significance to the required criteria.
> (2) If [the claimant] ha[s] an impairment(s) that is not described in [the listings], [the Social Security Administration] will compare [the claimant's] findings with those for closely analogous listed impairments. If the findings related to [the claimant's] impairment(s) are at least of equal medical significance to those of a listed impairment, [the Social Security Administration] will find that [the claimant's] impairment(s) is medically equivalent to the analogous listing.
> (3) If [the claimant] ha[s] a combination of impairments, no one of which meets a listing, [the Social Security Administration] will compare [the claimant's] findings with those for closely analogous listed impairments. If the findings related to [the claimant's] impairments are at least of equal medical significance to those of a listed impairment, [the Social Security Administration] will find that [the claimant's] combination of impairments is medically equivalent to that listing.[19]

"To prove that an impairment or combination of impairments equals a listing, a claimant 'must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.'"[20]

---

[17] **20 C.F.R. § 404.1520(a)(4)(iii)**.

[18] **20 C.F.R. § 404.1525(c)(3)** (citation omitted).

[19] **20 C.F.R. § 404.1526(b)**.

[20] ***KKC ex rel. Stoner v. Colvin***, 818 F.3d 364, 370 (8th Cir. 2016) (quoting ***Sullivan v. Zebley***,

7

The Eighth Circuit has consistently held that "[a]lthough it is preferable that ALJs address a specific listing, failure to do so is not reversible error if the record supports the overall conclusion."[21] "[R]emand is appropriate [only] where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit [a court] to conclude that substantial evidence supports the Commissioner's decision."[22]

### 1. Listing 1.02A

At the time of the ALJ's decision, Listing 1.02A provided:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b . . . .[23]

The regulations defined "inability to ambulate effectively":

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete

---

493 U.S. 521, 531 (1990)). *Sullivan* in turn relied on the following regulatory language: "a claimant's impairment is 'equivalent' to a listed impairment 'if the medical findings are at least equal in severity' to the medical criteria for 'the listed impairment most like [the claimant's] impairment.'" 493 U.S. at 531 (alteration in original) (quoting **20 C.F.R. § 416.926(a)** (1989)). The essentials of this regulatory language remain in effect today: "What is medical equivalence? [A claimant's] impairment(s) is medically equivalent to a listed impairment . . . if it is at least equal in severity and duration to the criteria of any listed impairment." **20 C.F.R. § 404.1526(a)**.

[21] ***Pepper ex rel. Gardner v. Barnhart***, 342 F.3d 853, 855 (8th Cir. 2003); *see also* ***Vance v. Berryhill***, 860 F.3d 1114, 1118 (8th Cir. 2017); ***Scott ex rel. Scott v. Astrue***, 529 F.3d 818, 822-23 (8th Cir. 2008); ***Karlix v. Barnhart***, 457 F.3d 742, 746-47 (8th Cir. 2006).

[22] ***Scott***, 529 F.3d at 822-23 (holding that remand was required when the record contained factual inconsistencies that the ALJ failed to resolve).

[23] **20 C.F.R. pt. 404, subpt. P, app. 1 § 1.02A**.

8

activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.[24]

Owens argues that because she uses a cane, her impairments meet or equal Listing 1.02.[25] But the Listing requires "the inability to walk without the use of *two canes/crutches* or a walker, limiting function of *both* upper extremities."[26] There is no evidence that Owens required the long-term use of an assistive device that required use of both her hands, nor that she otherwise suffered limitations in

---

[24] *Id.* § **1.00B(2)(b)**.

[25] The ALJ did not include the use of a cane in Owens's RFC, which will be discussed further in the RFC section.

[26] ***Dereschuk v. Colvin***, No. 15-cv-86 (TNL), 2016 WL 9454329, at *21 (D. Minn. Mar. 28, 2016), *aff'd sub nom.* ***Dereschuk v. Berryhill***, 691 F. App'x 292 (8th Cir. 2017); *see also* ***Bullock v. Astrue***, 277 F. App'x 325, 328 (5th Cir. 2007) (holding substantial evidence supported that plaintiff's impairments did not meet or equal Listing 1.02A when she "is able to walk with the help of a single cane, not a walker, two crutches[,] or two canes" and can "climb stairs with the use of a handrail"); ***Gleghorn v. Colvin***, No. 4:14-CV-426-CEJ, 2015 WL 1180358, at *13 (E.D. Mo. Mar. 13, 2015) (holding that ALJ did not err in failing to discuss Listing 1.02 when the "plaintiff has, at most, used a single cane to ambulate" and "[n]o evidence in the record . . . supports . . . that plaintiff is or has ever been unable to walk without an assistive device that limits the function of both his upper extremities").

9

the functioning of her upper extremities. The evidence of record does not support that Owens's impairments met or equaled Listing 1.02A.

I recommend finding that any error by the ALJ in failing to discuss Listing 1.02A was harmless.

### 2. Listing 1.08

Listing 1.08 provides:

> Soft tissue injury (e.g., burns) of an upper or lower extremity, trunk, or face and head, under continuing surgical management, as defined in 1.00M, directed toward the salvage or restoration of major function, and such major function was not restored or expected to be restored within 12 months of onset. Major function of the face and head is described in 1.00O.[27]

The regulations define "continuing surgical management":

> Under continuing surgical management, as used in 1.07 and 1.08, refers to surgical procedures and any other associated treatments related to the efforts directed toward the salvage or restoration of functional use of the affected part. It may include such factors as post-surgical procedures, surgical complications, infections, or other medical complications, related illnesses, or related treatments that delay the individual's attainment of maximum benefit from therapy. When burns are not under continuing surgical management, see 8.00F.[28]

The regulations further note that "[g]enerally, when there has been no surgical or medical intervention for 6 months after the last definitive surgical procedure, it can be concluded that maximum therapeutic benefit has been reached."[29]

Here, after the accident on April 23, 2017, Owens was hospitalized for more than two months and underwent multiple skin graft and debridement surgeries. She was discharged to outpatient follow-up in late June 2017. *See* AR 1723-25. By mid-August 2017, three areas of her left leg had still not fully healed, and another debridement

---

[27] **20 C.F.R. pt. 404, subpt. P, app. 1 § 1.08**.

[28] *Id.* **§ 1.00M**.

[29] *Id.* **§ 1.00N**.

10

procedure was performed at the wound clinic. AR 1697-98. A few days later, Owens fell getting into the car and hit her left leg, which further opened her wound and required stitches at the emergency room. AR 1689. The stitches did not help. *Id.* Owens was seen in follow-up at the wound clinic on August 24, September 7, September 26, and October 24; debridements were performed at each appointment. AR 1699-1700, 1851-55. Her last appointment with the wound clinic was on November 30, 2017. AR 1694-96. The provider noted that all wounds had healed and closed and that Owens required no ongoing wound care or dressing. AR 1696. Owens was discharged from the wound clinic with no follow-up appointments scheduled. *Id.* After that, the only treatment notes in the record are from Owens's primary care physician for pain management. *See* AR 1758-97. Owens did not require continuing surgical or medical care for her degloving injury. The record does not support that Owens was under "continuing surgical management" such that her impairments met or equaled Listing 1.08.

I recommend finding that any error by the ALJ in failing to discuss Listing 1.08 was harmless.

### C. RFC

Owens argues that substantial evidence does not support the ALJ's RFC determination—that she can walk without the use of a cane, as found by the ALJ. Owens asserts the ALJ improperly "cherry picked" from the record, rather than relying on the treatment notes as a whole.

A treatment record from shortly after Owens's release from the hospital, in late July 2017, indicates that Owens did not use a cane to walk but was limping due to her left leg. AR 1653. At physical therapy in late August 2017, providers noted Owens's gait was slow and she was safest when she used a cane, noting she had fallen and reopened her wound when walking without a cane. AR 1708. In September 2017, she told her primary care provider that her mobility was better and she was still using a cane; on objective examination, the provider noted she walked independently but limped. AR

11

1675, 1677. A treatment note from late November 2017 reflects "better mobility" and "limping with left leg not using a cane" on objective examination and that Owens reported using a cane, limping, and feeling like her knee and hip would give out when walking. AR 1668, 1670. After she had stopped physical therapy and her wounds had healed, treatment notes from her primary care provider in January 2018 reflect on objective examination Owens's gait was irregular and she walked with a cane. AR 1792-93, 1798. Her primary care provider's medication-management treatment records in February and April 2018 also note Owens walked with a cane. AR 1786, 1789. Medication-management treatment notes from May and June 2018, however, reflect that Owens ambulated normally. AR 1780, 1783. In July 2018, she reported "popping" her left knee two weeks prior when getting out of bed, and she used a cane at that appointment. AR 1776-77. In October 2018, she told her primary care provider that she had left her cane in Cedar Rapids, Iowa, and was trying to get it back, but she remained ambulatory. AR 1773. A treatment note from January 2019 also reflects she remained ambulatory (and does not mention the use of a cane). AR 1770. In February 2019, she reported falling onto her knees when taking the trash out a few weeks prior, and on objective examination, the provider noted she ambulated with a cane. AR 1766-67. In March 2019, she ambulated with a cane (the treatment note also reflects she reported a sprained ankle). AR 1762. In April 2019, a treatment record reflects she ambulated normally. AR 1758. At her consultative examination with Dr. Allen in June 2019, he found on objective examination Owens walked with an antalgic gait due to her left leg, she had to use a cane to keep her balance, and she was unable to tandem walk or to rise up on the heel and toe of her left foot. AR 1861.

Contrary to Owens's assertions, the ALJ considered all these treatment records. *See* AR 32-35. The ALJ limited Owens to jobs where she would not have to stand or walk for more than two hours in a day. AR 30. Although some treatment records reflect Owens walked with a cane, others show that she did not always use it—supporting the ALJ's conclusion that Owens could walk for short periods of time without using a cane.

12

Conscious of the deferential substantial-evidence standard, I cannot say that the ALJ's failure to include the use of a cane to walk is not supported by substantial evidence.

Owens also argues that substantial evidence does not support the ALJ's determination that she could sit for six hours in an eight-hour day. Owens points to her testimony at the administrative hearing that she can sit for only five to ten minutes at a time and a similar statement she made to Dr. Allen during the consultative examination in June 2019 (she also told Dr. Allen she could ride in a car for thirty minutes at a time). AR 92, 96-97, 1859. Owens also notes that throughout the hearing, she shifted positions from seated to standing. AR 86.

Owens's train accident required numerous surgeries on her left lower extremity from her hip to her knee. The consultative examiner observed in June 2019, more than two years after her accident, that Owens had a limited range of motion in her left hip and left knee; 4/5 flexion, extension, abduction, and adduction in her left hip and left knee; and tenderness to palpation and swelling in the left knee. AR 1861. But as the ALJ noted, "[t]he limitations observed at this examination were more restrictive than the claimant's presentations throughout the two year period after the claimant's discharge from physical and occupational therapy." AR 35. Substantial evidence supports this determination: Owens's primary care provider consistently observed normal range of motion in her left knee (with mild pain), no edema, and normal flexion, extension, and strength. *See* AR 1789, 1792, 1795, 1798 (January and February 2018: no edema, normal strength); AR 1767, 1773, 1777 (July 2018, October 2018, February 2019: no edema and "very mild" edema on palpation; normal range of motion with mild pain; strength, flexion, and extension 5/5); AR 1770 (January 2019: no edema).

The ALJ did not fully credit Owens's statements of her limitations. AR 31. The ALJ noted that from January 2018 to the time of the hearing, Owens's only treatment was medication-management appointments with her primary care provider, whose treatment notes reflect that Owens's pain was stable and under control. *See* AR 31; *see, e.g.*, AR 1770, 1773, 1785, 1789. The treatment records do not reflect that Owens

13

complained of difficulty sitting, and in March and April 2019, the provider noted "normal activity level." AR 1758, 1762. Substantial evidence supports the ALJ's determination that Owens could sit for six hours in an eight-hour workday.

I recommend affirming the ALJ's RFC determination.[30]

### III.  CONCLUSION

I recommend **affirming** the Commissioner's decision.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** on January 14, 2022.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

---

[30] Owens also argues that the ALJ should have included additional mental limitations, discussed in the section on severe impairments.